# EXHIBIT 1

May 24, 2019

Mr. Jeffrey Bossert Clark
Assistant Attorney General
U.S. DOJ—ENRD
P.O. Box 7611
Washington, D.C. 20044-7611

Submitted electronically to *pubcomment-ees.enrd@usdoj.gov*

Re: Proposed Consent Decree: *United States v. United Taconite, LLC*, Civil Action No. 19-01043;
United States District Court for the District of Minnesota
US v. United Taconite LLC, D.J. Ref. No. 90-5-2-1-11178

To the Assistant Attorney General:

Thank you for the opportunity to comment on the proposed consent decree ("Consent Decree") between the United States and United Taconite, LLC (UTAC) to resolve multiple violations of the Clean Air Act. *United States v. United Taconite LLC, D.J. Ref. No. 90-5-2-1-11178.* The Environmental Integrity Project (EIP), on behalf of former managers or senior staff of the U.S. Environmental Protection Agency with extensive experience implementing the Clean Air Act, and the Environmental Law and Policy Center (ELPC), on behalf of itself and its members, respectfully submit these comments. EIP is a nonprofit and nonpartisan organization that advocates for more effective enforcement of environmental law. ELPC is the Midwest's leading public interest environmental legal advocacy organization and works to protect the environment and public health.

We oppose entry of the proposed consent decree because it is neither fair, reasonable, nor in the public interest. We respectfully request that the Department of Justice respond to the specific questions that follow our comments below.

## I. SUMMARY

The Department of Justice Complaint[1] alleging UTAC's Clean Air Act violations and the proposed Consent Decree[2] to resolve those allegations was lodged before the U.S. District Court for the District of Minnesota on April 17 and 18, 2019, respectively. Our concerns are summarized first and then explained in further detail.

1. EPA's issued a Notice of Violation and Finding of Violation (NOV) to UTAC on February 21 of 2014 that identified several thousand specific violations of the National Emission Standards for Hazardous Air Pollutants from Taconite Iron Ore Processors

[1] United States v. United Taconite LLC, Case 0:19-cv-01043-NEB-LIB, (April 17, 2019) https://www.justice.gov/enrd/consent-decree/file/1156771/download "Complaint"
[2] United States v. United Taconite LLC, Case 0:19-cv-01043-NEB-LIB, (April 18, 2019), https://www.justice.gov/enrd/consent-decree/file/1156776/download "Consent Decree"

(NESHAP)[3] as well as violations of the Minnesota State Implementation Plan and UTAC's Title V permit. The second and third claims set forth in the Complaint incorporate the NOV by reference and identify specific acts of noncompliance that clearly violate the NESHAP. But for reasons unclear, the second and third claims do not allege violations of the NESHAP standard.[4]

2. The proposed consent decree ("Consent Decree") requires UTAC to pay a $50,000 penalty. That is absurdly low given that the Department of Justice Complaint ("Complaint") alleges that UTAC failed to meet emission limits for hazardous air pollutants or operating parameters for pollution controls for at least 713 days, while completely bypassing pollution controls for an additional 1,500 hours.

3. The Consent Decree "compliance requirements" do not address the alleged violations at all, or actually relax the NESHAP standards that have applied to UTAC's operations since 2006.

4. The Consent Decree appears to authorize a bypass of pollution control equipment ("Stack Cap Opening") that could violate NESHAP emission limits during startup, shutdown, or under other unspecified circumstances. The DC Circuit Court of Appeals ruled in 2008 that Clean Air Act standards for hazardous air pollutants do not allow for such exemptions.

5. The Consent Decree should not offset penalties in this case by treating the proposed installation of a new baghouse as a voluntary Supplemental Environmental Project ("SEP") on a unit that repeatedly failed to meet operating limits for its wet scrubbers. Since baghouses are already one of the primary methods for complying with the Taconite NESHAP, this project should not qualify as a voluntary action eligible for mitigation under the SEP policy.

6. The Consent Decree would terminate after a single year, so long as UTAC has met its minimal requirements and submitted an application to amend its Title V permit to incorporate just one of the Consent Decree's "compliance requirements." Given its skeletal requirements, commenters do not understand why this Consent Decree should be lodged in federal court rather than processed as an administrative order on consent, unless its primary purpose is to preclude a citizen suit that would seek an adequate penalty and appropriate remedy for the violations in question

---

[3] U.S. EPA Region 5, Notice of Violation and Finding of Violation, United Taconite, LLC (February 21, 2014) "NOV"

[4] The second and third claims are limited to violations of UTAC's Title V permit and the State Implementation Plan that were also identified in the 2014 NOV along with NESHAP violations.

### II. Standard of Review

Before approving a consent decree, the Court must first determine whether it is "fair, reasonable, adequate, and consistent with applicable law." *United States v. BP Exploration & Oil Co.*, 167 F. Supp. 2d 1045, 1049 (N.D. Ind. 2001); *see also United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991). The Court must also determine whether its terms are "consistent with the purposes that [the statute] is intended to serve." *Akzo Coatings of Am.*, 949 F.2d at 1435.

A Consent Decree should not have terms that are "inappropriate, improper, inadequate" or "inconsistent" with the Clean Air Act. 42 U.S.C. § 7413(g); *see also Akzo Coatings of Am.*, 949 F.2d at 1435. Although the agency gets some deference, the purpose of judicial review is not to give "rubberstamp approval." *BP Exploration & Oil Co.*, 167 F. Supp. 2d at 1050. Rather, judicial review ensures that the decree protects the public interest. *Id.* at 1049; *see also United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 2014 WL 64655, at *9 (N.D. Ill. Jan. 6, 2014) (to determine whether a consent decree is reasonable, "the Court will consider whether it is in the public's best interest"), *aff'd*, 792 F.3d 821 (7th Cir. 2015). Therefore, Courts should not approve consent decrees that are "contrary to the public good" or "inequitable." *BP Exploration & Oil Co.,* 167 F. Supp. 2d at 1049.

Consent decrees are substantively unfair when their requirements do not deter future violations or do not promote accountability. *See United States v. BP Products North America Inc.*, No. 212-cv-00207, 2012 WL 5411713 at *3 (N.D. Ind. Nov. 6, 2012) (stating that fairness requires consent decree terms to "prevent similar non-compliance" in the future and meet "standards of accountability").

### III. Relevant NESHAP Standards

The UTAC plant in Forbes, Minnesota, is subject to the requirements of the Taconite NESHAP[5], a 2003 federal rule designed to control major sources of hazardous air pollutants from facilities that extract iron from magnetite or hematite ores. That rule requires furnaces and other units to meet specific emission limits for particulate matter (PM), as maintaining low PM emission rates is expected to correspond to lower levels of hazardous air pollution from taconite plants, which include lead, other toxic metals, and acid gases.[6] The rule does not require continuous monitoring of PM, however, and actual emissions are measured only occasionally through stack tests.

These periodic stack tests are used to specify how pollution controls must be operated to assure that PM limits will be met, which include maintaining minimum pressure drop and daily average water flow rates at wet scrubbers.[7] Wet scrubbers are more effective when the velocity

---

[5] U.S. EPA. Final Rule: National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing. 40 CFR 63 Subpart RRRRR, (October 30, 2003), https://www.govinfo.gov/content/pkg/FR-2003-10-30/pdf/03-22309.pdf

[6] For example, straight gate indurating furnace processing magnetite are required to meet particulate matter limits of 1.1 gf/dscf (40 CFR 63.9590(a), Pt. 63, Table 1). Taconite Rule, Preamble, Section II, Part C

[7] 40 CFR 63.9590 (b)

of waste gas is high enough to disperse the water injected into the small droplets that are most effective in removing particulates, acid gas, and other pollutants. As pressure drops or flow rates decline, wet scrubbers are unable to maintain the proper liquid-to-gas ratios and their performance declines accordingly. [8] These requirements assume that wet scrubbers cannot meet the PM emission limits that are supposed to control hazardous air pollutants unless they operate within the parameters for pressure drop and flow rate established through testing.[9]

Taconite plants are required to take corrective action within 10 days whenever these operating parameters are not met and if that fails, are allowed two additional 10 day periods to correct the problem. If pollution controls still cannot meet their parameters after three tries within 30 days, facilities must report the violation within five days and schedule a test to measure PM emissions and determine the parameters needed to ensure continuous compliance with the PM limit.

The Taconite NESHAP standards are consistent with requirements reflected in UTAC's Clean Air Act "Title V" operating permit, which incorporates all federally enforceable requirements, as well as the federally enforceable provisions of Minnesota's State Implementation Plan.

## IV. PENALTY DOES NOT REFLECT DURATION, SERIOUSNESS, OR ECONOMIC BENEFIT OF NONCOMPLIANCE OF VIOLATIONS OR

The Complaint's first claim for relief alleges that UTAC failed to meet PM limits at one or more of its two large indurating furnaces at least 13 times between January of 2012 and June of 2015. The second and third claims allege that between January 1, 2010 and December 31, 2016, UTAC:

- Failed to meet required pressure drop limits or water flows for at least 700 days at pollution control equipment intended to limit emissions from the crude ore unloading building baghouses, wet scrubbers on the fourth stage crushers, ore crushers, and various components of lines 1 & 2;
- Bypassed all pollution controls while operating certain process equipment for at least 1500 hours.

The Complaint identifies at least 2,213 separate violations subject to the maximum penalty of $37,5000 per day for each violation that occurred before November 3, 2015, and $95,284 per day for each violation thereafter.[10] The consent decree resolves all of these claims for a mere $50,000, or less than $25 for each of the more than 2,000 violations identified in the complaint.

---

[8] Environmental Protection Agency, *EPA Air Pollution Control Cost Manual,* Section 6, Chapter 2.4.1 (January 2002), https://www3.epa.gov/ttn/catc/dir1/cs6ch2.pdf

[9] Operating limits "….ensure that control devices operate properly on a continuing basis." 67 Fed.Reg.77562, 77567 (December 18, 2002).

[10] Complaint, Paragraphs 41 and 45

The Consent Decree's low penalty fails to deter future violations or serve the public interest under the circumstances presented by this case and does not reflect the criteria that EPA and federal courts "shall consider" when assessing civil penalties under the Clean Air Act.[11] Among other factors, EPA and courts must evaluate the duration and seriousness of the violations and the "economic benefit" the violator gained by avoiding or delaying expenditures for compliance, as well as the defendant's "good faith" attempts to return to compliance.

### *A. UTAC Violations Are Unquestionably Serious and Long-Running*

There can be little doubt that the violations are serious, as they involve the repeated failure to operate pollution controls and illegal emissions of particulates, lead and other HAP's, and sulfur dioxide and nitrogen dioxide. These illegal emissions include pollutants or precursors that increase exposure to fine particles that that contribute significantly to heart and lung disease and premature mortality. The Complaint alleges that this noncompliance persisted for seven years, or nearly three years *after* EPA's February 21, 2014 letter notifying UTAC of these violations and the specific evidence used to support its claims.

The case is not about the occasional exceedance of an emission limit despite a company's best efforts. According to the Complaint, UTAC completely bypassed pollution controls at the stacks serving the plant's two large indurating furnaces for at least 1,500 hours over the seven-year period that ended on December 31, 2016. EPA estimates that 80% of hazardous metals and virtually of the acid gases from taconite plants are emitted from such furnaces.[12] EPA's technical analysis supporting the Taconite NESHAP states that wet scrubbers are capable of reducing PM emissions (and presumably associated hazardous metals) by as much as 99%.[13] If true, then the UTAC bypasses released up to a hundred times the amount of PM and hazardous metals normally removed through wet scrubbers.

### *B. Penalty Does Not Recover the Economic Benefit UTAC Gained from Its Noncompliance s*

As explained above, when wet scrubbers do not meet their pressure drop or water flow requirements, UTAC and other plants subject to the Taconite NESHAP must make at least three attempts to diagnose and correct these deviations within thirty days and schedule a new emissions test if those efforts do not succeed. According to the NOV, UTAC ignored these testing requirements on multiple occasions[14], thereby avoided spending time and money needed to keep its wet scrubbers operating within parameters needed to control particulates and HAP's. For example, EPA estimated in 2003 that each stack test (or "performance test") to measure PM emissions from taconite units would cost an estimated $8,000, or more than $11,500 in today's dollars.[15]

---

[11] 42 U.S.C. §7413(e)(1).
[12] Background, Section 3.0
[13] Background, Section 4.1.1
[14] NOV, Paragraph 52.
[15] Email from Conrad Chin, U.S. EPA to C. Zukor and Chris Sarsony of Alpha-Gamma Technologies, Inc. entitled, "MACT Compliance Cost", EPA-HQ-OAR-2002-0039-0077, (August 26, 2003). EPA's 2003 estimate based on

The NOV estimated that UTAC failed to conduct at least five of the follow-up performance tests required by the NESHAP[16], but the evidence indicates the plant may have failed to conduct the required tests on other occasions given the repeated failure of wet scrubbers to comply with operating limits. UTAC would have also have incurred additional costs had it taken the time to diagnose and correct each deviation from wet scrubber parameters within 10 days, as the NESHAP requires, or invested in better pollution controls or operating procedures to stay in compliance with the standards. Commenters do not believe a $50,000 recover could begin to recover the amount UTAC is likely to have saved by simply ignoring these NESHAP requirements.

### *C. UTAC Does Not Qualify for Penalty Mitigation*

Penalties may be reduced under the Clean Air Act where a violator lacks the ability to pay, or to recognize good faith efforts to return to compliance. Neither of these criteria apply in the present case. The Forbes taconite plant is owned by Cleveland-Cliffs Natural Resources ("Cliffs"), with annual revenues of $2.332 billion in 2018 compared to $1.866 billion in 2017, according to the company's latest 10-K report to the Securities Exchange Commission. The same 10-K reports that annual operating income jumped from $390 to $673 million between 2017 and 2018 while net income more than tripled, rising from $363 million in 2017 to $1.128 billion last year. The Forbes plant has significantly increased production to take advantage of higher taconite prices, while overall revenue from Cliffs' Mining and Pelletizing segment increased by $527.8 million in 2018 compared to the prior year.[17]

The is not much evidence to suggest that Cliffs deserves a lower penalty based on its good faith efforts to comply. The company's spokesman apparently told reporters on April 23, 2019, that, "…the alleged violations date back five years and were corrected years ago,"[18] and dismissed them as "largely administrative in nature and related to past record-keeping..."[19] But the Complaint filed in this case alleges that these violations continued from January 1, 2010 through December 31, 2016, which is less than two and a half years ago, and include at least 1500 hours when the plant completely bypassed its wet scrubbers to release uncontrolled amounts of PM and hazardous air pollutants, and 700 days during which those scrubbers failed to meet operating conditions that are supposed to ensure they actually work. These are not "record-keeping" violations.

EPA cited specific evidence from UTAC's own plant records to support the violations enumerated in the NOV sent to the company in February of 2014. But after the settlement was

2002 data. Adjustment for inflation to estimate 2019 cost based upon US Department of Labor "CPI" Calculator.https://www.regulations.gov/document?D=EPA-HQ-OAR-2002-0039-0077

[16] NOV, Table 3.

[17] U.S. Securities and Exchange Commission, Form 10-K, Cleveland-Cliffs Inc. (February 8, 2019), http://d18rn0p25nwr6d.cloudfront.net/CIK-0000764065/79fb7c4c-83fd-4040-b5ca-d072f9b1833d.pdf

[18] CBS Duluth, *Eye on Mining: Cleveland-Cliffs gets $50K fine for air pollution violation*, (April 23, 2019), https://cbs3duluth.com/top-stories/2019/04/23/eye-on-mining-cleveland-cliffs-gets-50k-fine-for-air-pollution-violation/

[19] Duluth News Tribune, *Cliffs fined for air-quality violations*, (April 22, 2019), https://www.duluthnewstribune.com/business/energy-and-mining/4602566-cliffs-fined-air-quality-violations

announced in April of 2019, the company's spokesman claimed "So once the EPA notified UTAC of the allegations a thorough evaluation was conducted with EPA and it was discovered that a significant portion of the allegations turned out to be false alarms." This statement is misleading in suggesting that both EPA and UTAC reached that conclusion, as the Complaint issued last month essentially reiterates the allegations set forth in the 2014 NOV and adds that the violations continued through 2016.

Commenters understand that UTAC is not required to admit liability in consent decrees in civil cases. But it is difficult to credit a defendant's "good faith efforts to comply" after it has so casually misrepresented key facts supporting EPA's claims.

### *D. UTAC's installation of a baghouse at 1F Crusher does not qualify as a "Supplemental Environmental Project."*

The Consent Decree treats UTAC's plan to spend $488,542 on a "more efficient dry fabric filter PM control system" as a voluntary Supplemental Environmental Project (SEP), which allows that expenditure to offset the higher penalties that UTAC should have paid. The baghouse will apparently be installed on the 1F Crusher, which exhausts through the SV017 vent.[20]

The NOV found that the wet scrubber serving the SV017 vent failed to meet water flow limits 20.9% of the time in the last half of 2012, which is a NESHAP violation. SV017 exhausts 1F Crusher's emissions; therefore, assuming these violations were incorporated into the Complaint, installation of a baghouse at 1F Crusher should be required to remedy or mitigate violations from this unit and not credited as a voluntary SEP that offsets penalties for UTAC's violations.

As explained in EPA's own policy:

> "SEPs are projects or activities that go beyond what could legally be required in order for the defendant to return to compliance, and secure environmental and/or public health benefits in addition to those achieved by compliance with applicable laws…. Where a proposed project could reasonably comprise part of the injunctive relief portion of a settlement, it should not be a SEP."[21]

Fabric filters (or baghouses) are identified as one of the primary means of complying with the Taconite NESHAP in the "Background Document" that EPA prepared to support the standard in 2002.[22] The rule itself requires operating limits (to identify and eliminate leaks)

---

[20] Minnesota Pollution Control Agency, United Taconite LLC – Fairlane Plant, Air Individual Permit, 13700113-007, Amended January 9, 2017, P. 281, https://www.pca.state.mn.us/sites/default/files/13700113-007-aqpermit.pdf

[21] Supplemental Environmental Projects Policy: 2015 Update, US Environmental Protection Agency (March 10, 2015) p. 1.

[22] National Emission Standards for Hazardous Air Pollutants (NESHAP) for Taconite Iron Ore Processing Plants, Background Information for Proposed Standards, Office of Air Quality Standards, US Environmental Protection Agency (EPA-453-R-02-015) December 2002, at 4-3.

when baghouses are used to meet the PM emission limits. In fact, the UTAC plant already had 10 baghouses deployed by 2002, before the Taconite NESHAP was even promulgated.[23]

The Consent Decree impermissibly labels the fabric filter at 1F Crusher as a SEP, and, therefore, the Consent Decree impermissibly provides UTAC an unwarranted reduction in its civil penalty.

## V. CONSENT DECREE COMPLIANCE REQUIREMENTS DO NOT ADDRESS ALLEGED VIOLATIONS OR REQUIRE COMPLIANCE WITH NESHAP STANDARDS TO LIMIT HAZARDOUS AIR POLLUTION

The minimal compliance requirements set forth in Section VI of the Consent Decree do not address the violations alleged in the Complaint or in EPA's Notice Letter, displace more stringent NESHAP standards that already apply to UTAC, and create an impermissible exemption for emissions during startup, shutdown, or malfunctions.

### *A. Section VI.A: "Indurating Furnace Waste Gas: Wet Scrubber Operation during Low Production"*

Section VI.A. requires UTAC to identify those instances when wet scrubbers at indurating furnaces fail to meet "lower differential pressure operating limits" during low productions and the deviation has not been corrected within three consecutive 10-day periods. UTAC is required to diagnose and correct the problem or justify taking no additional action and to report its findings to EPA on July 30 "…in the first reporting period after establishing the lower differential operating limit based on testing during normal low production operation," and the following January 30. Since the Consent Decree does not define "low production," it is unclear what circumstances trigger these requirements. But taken at face value, the actions that UTAC may take under Paragraph 12 of this section fall short of what the company must already do to comply with current federal rules. For example:

- The Taconite NESHAP requires facilities to make three consecutive attempts to correct any deviation from pollution control parameters regardless of the level of production at indurating furnaces.[24] At best, it is unclear whether Section VI.A of the Consent Decree is intended to displace some or all of the NESHAP requirements at 40 CFR 63.9634(j).

- If three consecutive attempts to correct deviations from pollution control parameters do not succeed, the Taconite NESHAP requires UTAC to provide EPA with a written report within five days that documents the types of corrective actions that have been taken.[25] The Consent Decree only requires these events to be reported on two occasions six months apart, and allows UTAC to justify decisions not to take corrective action. Commenters note that reporting obligations arise only after UTAC has tested wet

[23] Id., Table 4.2-2, p. 4-7. UTAC is the successor to the EVTAC facility identified in the table.
[24] 40 CFR 63.9634(j)(3).
[25] 40 CFR 63.9634(j)(4).

scrubber parameters under "low production" scenarios, which means the first of the two required reports may not be submitted until July 30 of 2020.

- The NESHAP also requires semi-annual reporting to identify all deviations from pollution control parameters, not just those that remain uncorrected after three consecutive 10-day attempts.[26] The NESHAP reports must include significantly more detail[27] (such as the time, duration, and date of each deviation) than is required under paragraph 12 of Section VI.A.

- The NESHAP requires taconite plants to conduct another stack test to "demonstrate compliance with the applicable emission limitation" when they are unable to fix a deviation from control device parameters after three consecutive attempts."[28] Paragraph 12 includes no such requirement.

As noted earlier, wet scrubbers must achieve the right balance between water flow rates and the velocity of waste gas to efficiently remove particulates and acid gases. The NOV indicates that the wet scrubber for one of the indurating stacks failed to meet water flow parameters 45% of the time in the first half of 2012, and nearly 40% of the time in the second half. The Consent Decree does not address UTAC's failure to maintain the required flow rates at wet scrubbers serving indurating furnaces at all, focusing only on pressure differentials when furnaces run during undefined "low production" scenarios.

### *B. Section VI.B: Wet Scrubbers Other Than Indurating Furnace Wet Scrubbers*

Section VI.B identifies compliance requirements for wet scrubbers that are less stringent than NESHAP standards that already apply. For example, Paragraph 16a requires UTAC to report on a semi-annual basis any deviations from wet scrubber or water flow parameters that are not corrected after three 10-day attempts. As explained above, the NESHAP requires UTAC to submit written reports with five days if three consecutive attempts to correct deviations are unsuccessful. The NESHAP requires additional semi-annual reports that must identify ALL deviations from pollution control parameters, not just those that remain uncorrected after three consecutive attempts.

Paragraph 16b of this section does include the NESHAP requirement to conduct a stack test to measure emissions if three consecutive attempts have failed to correct pollution control deviations. These testing requirements apply to all wet scrubbers under the NESHAP. But under the Consent Decree, they apparently will be limited to "wet scrubbers other than indurating furnace wet scrubbers."

---

[26] 40 CFR 63.9641(7).
[27] 40 CFR 63.9641(b)(8).
[28] 40 CFR 63.9634(j)(3); 63.9622(f).

***Section VI.C: Stack Cap Emissions***

Section VI.C requires UTAC to automate the fueling of its indurating furnaces to ensure that only natural gas is burned within five minutes of each "Stack Cap Opening." The Consent Decree does not provide a clear definition of what a "stack cap" is or how or why it is opened. But from the context, the Consent Decree appears to referring to circumstances when waste gases from the furnace are vented directly to the atmosphere instead of routed to the wet scrubber that are supposed to remove particulates and acid gases. This section of the Consent Decree is also apparently designed to authorize these bypasses during periods of startup and shutdown and perhaps during malfunctions.

Under the Consent Decree, a "Stack Gas Opening" is triggered by a "Stack Gas Event." The Consent Decree lists several examples of a Stack Gas Events – "e.g., Cold Startup, Shutdown after Cold Startup, Shutdown after Normal Operation." – that are clearly not meant to exclude other scenarios. The lack of definition makes it impossible to know when the particular requirements of this section become effective. The NOV alleges that between July 2012 and June 2013, UTAC released uncontrolled amounts of particulate matter from the indurating furnaces as a result of bypassing the wet scrubbers that are supposed to control that pollution.[29] These claims are incorporated in paragraph 43 of the Complaint. But without knowing what accounts for these bypass events, it is impossible to know whether addressing emissions caused by the opening of the "Stack Cap" are the appropriate remedy for the violations alleged in the Complaint.

Appendix A of the Consent Decree provides an equation for determining whether Stack Cap events that last longer than five minutes will cause particulate emissions to exceed the limits in "Table 1." The latter presumably refers to Table 1 of the NESHAP,[30] which requires indurating furnaces to meet an emission limit of 0.01 grains per dry standard cubic feet.

The Appendix A equation relies on "Emission Factors" to determine PM from coal combustion in taconite furnaces that are not explained or identified in the Consent Decree. While EPA has published "AP-42" estimates of PM emissions from coal burning grate furnaces at taconite plants, those are expressed as pounds of PM per ton of pellets fired rather than as grains per dry standard cubic feet, which is the basis for the NESHAP standard. Significantly, EPA has assigned these AP-42 factors a D or E rating, which means their reliability in predicting PM emissions from a specific furnace is below average or poor.[31]

The Consent Decree anticipates that the uncontrolled release of PM from the indurating furnaces during the first five minutes of any bypass (Stack Cap event) would not be counted when measuring compliance with the NESHAP PM limit, so long as natural gas is the fuel source thereafter. It will also exempt PM emissions at the furnaces that are caused by "non-combustion" sources like the burning of pellets for an unlimited amount of time during bypasses,

[29] NOV, Table 6, pp. 9-10.
[30] 40 CFR 63.9590(a).
[31] AP 42 Fifth Edition, Volume 1, Chapter 11.23 Taconite Ore Processing, Table: Mineral Products Industry, Table 11.23-2 (2/97); AP 42 Vol. 1, Introduction pp. 9-10, (1/95).

so long as natural gas is the exclusive source of fuel after five minutes. While the Taconite NESHAP excludes emissions during startups, shutdowns, and malfunctions (SSM) under certain circumstances, those exemptions rely upon a generic SSM rule that was vacated by the DC Circuit Court of Appeals in 2008 after the Court ruled that emissions standards for hazardous air pollutants under Section 112 must apply at all times. [32]

Commenters would appreciate any response to specific questions about the Compliance Requirements of the Consent Decree:

- Must UTAC continue to comply with all provisions of the Taconite NESHAP, notwithstanding the "Compliance Requirements" of the Consent Decree, including the specific NESHAP standards identified in our comments?
- How is "Low Production" defined for purposes of the requirements in Section VI.A?
- What is a Stack Cap and how and why does it "open?"
- Is a "Stack Cap Opening" the same as a bypass?
- How is a "Stack Cap Event Type" defined? Does it include "Events" beyond the three examples listed in the Consent Decree definition?
- What "Emission Factors" will UTAC use to quantify PM emissions from combustion or non-combustion at the indurating furnaces?
- Is there any limit on the number or duration of Stack Cap Openings?
- Can UTAC continue to burn coal for more than five minutes after a Stack Cap Opening so long as it quantifies emissions as required by the Consent Decree?
- Why are PM emissions not quantified during Stack Cap Events so long as natural gas is burned within five minutes, when these events allow unlimited amounts of PM and other pollutants from pellet burning and other "non-combustion" sources?
- Does the Consent Decree authorize UTAC to exceed PM limits during Stack Gas Openings, whether or not it burns gas or coal during such events?
- Will the Consent Decree expire after a year even if Section VI.C has not yet been made enforceable under UTAC's Title V permit?

## VI. CONSENT DECREE SHOULD REQUIRE ONLINE PUBLIC REPORTING

The Consent Decree should be amended to include online public reporting to promote transparency and ensure UTAC follows the requirements of the Consent Decree. Consent decrees are substantively unfair when their requirements fail to deter future violations or fail to promote accountability. Because the Consent Decree lacks public reporting requirements, its terms are insufficient to deter further violations or promote accountability.

The online public reporting should be housed on a dedicated website accessible to the public and include all of UTAC's compliance reports required by the Clean Air Act and the Proposed Consent Decree. Providing an easy-to-access database containing all of UTAC's

---

[32] *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008)

compliance reports will provide the public an effective tool to conduct their own compliance monitoring of UTAC.

There is precedent for this type of public online reporting in other Consent Decrees, such as the one covering the Chicago Police Department. There is also precedent for this type of online public reporting in other contexts, such as the federal Coal Ash Rule, which requires regulated facilities to post all of their compliance reports on a website hosted by the facility.

Requiring public online reporting follows EPA's public statements encouraging the use of online public reporting in settlements. In addition, requiring online public reporting decreases the burden on EPA from responding to information requests through the Freedom of Information Act. As U.S. EPA guidance notes: "[H]aving information available to the public reduces the burden on EPA responding to multiple information requests."

Thank you for considering our views.

/s/ Eric Schaeffer, Esq.
Eric Schaeffer*
Director, Environmental Integrity Project
1000 Vermont Ave, Suite 1100
Washington, DC 20005
(202)-263-4440
echaeffer@environmentalintegrity.org

/s/ Jeffrey Hammons, Esq.
Jeffrey Hammons
Environmental Law and Policy Center
35 East Wacker Drive, Suite 1600
Chicago, Illinois 60601
(785) 217-5722
JHammons@elpc.org

/s/ George Hays, Esq.
George Hays
former Assistant Regional Counsel
US EPA, Region IX

/s/ Steven Silverman, Esq.
Steven Silverman
former Attorney-Advisor
US EPA, Office of General Counsel (1980-2017)
Recipient of Distinguished Career Service Award

/s/ Bruce Buckheit, Esq.
Bruce Buckheit
former Director
Air Enforcement Division
USEPA Office of Civil Enforcement

/s/ Scott Throwe
Scott Throwe
former Environmental Specialist
USEPA Office of Compliance

*former Director, Office of Civil Enforcement (1997-2002), US EPA